IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| PHOSASSET GmbH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civil Action File No. | 4:21CV-205 |
| | ) | |
| GULFSTREAM AEROSPACE CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |

# COMPLAINT

Comes Now Plaintiff PhosAsset GmbH ("PhosAsset"), by counsel, and for its Complaint against Defendant Gulfstream Aerospace Corporation ("GAC"), states as follows:

**Nature of the Action**

1.

As alleged more fully below, in 2008, GAC manufactured a G450 aircraft containing a structural manufacturing defect that caused the aircraft to be unairworthy and to deviate from its Federal Aviation Administration ("FAA") approved Type Certificate and its Airworthiness Certificate, and violate the Federal

Aviation Regulations, and the European aviation regulations.

2.

Rather than remedying the condition, GAC represented the aircraft was airworthy and in compliance with the Federal Aviation Regulations.

3.

PhosAsset relied upon GAC's representation of the aircraft's airworthiness to its detriment, directly resulting in millions of dollars in damages for diminution in value, loss of use, and other damages.

4.

The aircraft was grounded in November 2020 following discovery of the defect.

5.

Despite misrepresenting the aircraft as airworthy, and despite the failures of its manufacturing and quality control processes, GAC attempted to classify the defect as minor, a classification rejected by the FAA.

**Parties**

6.

PhosAsset GmbH ("PhosAsset") is a Swiss company with its principal place of business in Fribourg, Switzerland.

7.

Gulfstream Aerospace Corporation ("GAC") is a Georgia corporation with a principal place of business in Savannah, Georgia.

8.

Plaintiff is duly qualified to bring this action, having all met all legal prerequisites.

## Jurisdiction and Venue

9.

This court has subject matter jurisdiction over the entire dispute pursuant to 28 U.S.C. §1332, as complete diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of interest, costs and attorney's fees, and personal jurisdiction over GAC because it is a Georgia corporation.

10.

Venue is proper in this court pursuant to 28 U.S.C. § 1391.

## Background

11.

PhoAsset is the registered owner of a G450 aircraft, serial number 4130, registered with the Swiss Confederation's Federal Office of Civil Aviation as HB-JGB (hereinafter "the aircraft").

12.

The G450 was designed for private or business use.

13.

GAC designed the G450 as a modified version of its predecessor, the GIV-SP.

14.

Upon information and belief, GAC began production of the G450 in October 2004.

15.

The G450 uses twin Rolls-Royce Turbojet engines and can fly over 600 miles per hour. It can accommodate 18 passengers and has a range of almost 5,000 miles.

16.

The G450 is now out of production.

17.

The aircraft was manufactured at GAC's headquarters in Savannah, Georgia.

18.

GAC was the designer, manufacturer, distributor and seller of the aircraft, and, at all relevant times, has been in the business of designing, building, manufacturing, assembling, testing, marketing, inspecting, distributing, and selling aircraft.

19.

Upon information and belief, throughout the manufacture of the aircraft, GAC used its own employees, including FAA designated engineering representatives and designated airworthiness representatives, all or some of whom were employees of GAC, to review the design, type conformance, and airworthiness of the aircraft, and cause the aircraft to improperly be certificated as airworthy.

20.

On or about June 24, 2008, GAC's Production Manager, Jason Lovicz, Sr., certified that the aircraft had been inspected and was eligible for issuance of a Standard Airworthiness Certificate. *See* Exhibit A.

21.

In the aviation industry, "airworthy" or "airworthiness" means that the aircraft conforms to its type certificate, and is in a condition for safe operation.

22.

On or about June 24, 2008, a representative of GAC's FAA-approved Organization Designation Authorization ("ODA"), Paul D. Jacobs, certified that the aircraft met the requirements for issuance of a Standard Airworthiness Certificate. *See* Exhibit A.

23.

A representative of GAC's FAA-approved ODA, Paul D. Jacobs, issued a

Standard Airworthiness Certificate for the aircraft on June 26, 2008.  *See* Exhibit B.

24.

On or about October 22, 2008, a representative of GAC's FAA-approved ODA, John P. Bohannon, Jr., created and provided to the FAA a Conformity Inspection Record that stated that he had verified that all design criteria had been met, the aircraft's data was current and correct, the aircraft's data and records had been reviewed, and that the aircraft was eligible for issuance of an Export Certificate of Airworthiness.  *See* Exhibit C.

25.

A representative of GAC's FAA-approved ODA, John P. Bohannon, Jr., issued the aircraft's Export Certificate of Airworthiness on October 22, 2008.  *See* Exhibit D.

26.

The aircraft entered into service on or about October 21, 2008.

27.

The aircraft was sold for $45,500,000.00.

28.

G450s that were delivered in 2008/2009 have a current fair market value in the range of $10-15 million.  Upon information and belief, 34 G450s, approximately 10% of the total fleet, are currently on the market.

29.

On or about November 12, 2020, the aircraft was taken to Jet Aviation Geneva AG ("Jet Aviation") in Geneva, Switzerland, for its GAC-mandated 144-month inspection.

30.

The 144-month inspection is part of GAC's FAA-approved instructions for the continued airworthiness of the aircraft.

31.

A manufacturer's instructions for continued airworthiness are FAA-required documents designed to ensure that an aircraft remains airworthy after it is delivered.

32.

Under both the Federal Aviation Regulations and European aviation regulations, an owner must comply with GAC's instructions for continued airworthiness, and the aircraft must be airworthy to be legally flown.

33.

At all times since GAC's delivery of the aircraft, the instructions for continued airworthiness have been followed by the owner/operator of the aircraft and the aircraft has been maintained with the highest standard of care.

34.

The protocol for the 144-month inspection includes the aircraft's first post-

delivery below-floor inspection.

35.

The below-floor inspection by Jet Aviation in Geneva revealed a major structural manufacturing defect in the aircraft which had been present, yet concealed, from the time GAC first delivered the aircraft. Specifically, the aircraft had numerous oval/egg-shaped and sideways holes in the structural floor beams, and aluminum shavings were found inside the sealant under the floorboard.

36.

Upon information and belief, the holes reduce the structural strength of the floor beams, forcing the fuselage to bear more weight. The presence of these defects violated the type and airworthiness certificates and rendered the aircraft unairworthy and out of compliance with the type and airworthiness certificates at the time it was delivered by GAC.

37.

On January 6, 2021, GAC admitted that the defect was created during the manufacture of the aircraft. *See* Exhibit E.

38.

GAC claimed that repairing the defect was a minor repair, and proposed a repair that involved drilling additional holes in the floor beams without having its engineers produce new structural drawings or conduct any new structural analysis

to assess the risks to the aircraft.  *See* Exhibit F.

39.

After repeated unsuccessful requests to GAC to recognize that the defect was a major defect in a load bearing structure of the aircraft, PhosAsset requested that the FAA review GAC's proposed repair, and the FAA, disagreeing with GAC, found that the repair was a major repair.  *See* Exhibit G.

40.

Subsequent to the FAA's determination, GAC issued documents specifying additional repair procedures, including the drilling of 16 additional holes and installation of numerous retainers and nutplates, which confirms that the defects in the structural floor beams, contrary to GAC's initial position, were major.  *See* Exhibit H.

41.

In order to attempt to mitigate damages, the aircraft underwent the major repair in Geneva, Switzerland.

42.

Due to the discovery of the structural defect, and GAC's claims that the repair was minor and could be addressed with limited structural alterations, the aircraft was grounded for almost eight months.

43.

Due to the manufacturing defect, the aircraft was not in compliance with its type certificate and was not in the condition it was represented to be in at the time it was delivered.

44

Had GAC disclosed the condition, the aircraft could not have been certified as airworthy and in conformance with the G450 type certificate, and the aircraft could not have been sold or exported.  Moreover, neither PhosAsset, nor anyone else, would have bought the aircraft since it was out of compliance with legal requirements.

45.

Instead, GAC represented the aircraft as legally and factually airworthy and in compliance with the type and airworthiness certificates and sold it for $45,500,000.00.

46.

The instructions for continued airworthiness published by GAC do not call for removal and inspection of the floorboards and floor beams until the 144-month phase inspection.  Accordingly, GAC knew or should have known that production defects in the structural floor beams would not be discovered until 12 years after the aircraft was delivered, and would not interfere with GAC's successful efforts to

obtain additional FAA authorization to self-certify its aircraft.

47.

After the aircraft was improperly certified as airworthy in 2008, GAC failed to disclose the major structural defect to the FAA, to PhosAsset, or anyone else.

48.

As result of the manufacturing defect, and the improper representations by GAC, the aircraft was grounded for almost eight months, and the aircraft's value has been reduced by millions of dollars.

**Count I – Negligent Misrepresentation**

49.

PhosAsset realleges and incorporates by reference paragraphs 1-48, above, as if set forth verbatim.

50.

By virtue of its representations and failures to disclose, specified above, GAC represented to the FAA and PhosAsset that the aircraft did not have any major structural defects and conformed to the G450 type design.

51.

During the manufacturing and inspection process, each incidence of non-conformity with the aircraft's type design should generate substantiating

documentation, repairs and subsequent inspections.

52.

GAC either did not institute policies and procedures for manufacture and/or inspections of the structural floor beams, instituted deficient policies and procedures for manufacture and/or inspections of the structural floor beams, and/or violated or ignored their own policies and procedures.

53.

GAC knew or should have known that its representations were false.

54.

It was reasonably foreseeable and well known to GAC that the aircraft's purchasers, such as PhosAsset, would rely on GAC's representations that the aircraft was airworthy after manufacture and at the time of export, did not have any concealed major structural defects and conformed to the G450 type design.

55.

PhosAsset reasonably relied on GAC's false representations to its detriment.

56.

GAC's false representations were a direct and proximate cause of PhosAsset's damages.

## Count II - Fraud/Intentional Misrepresentation/Intentional Concealment

57.

PhosAsset realleges and incorporates by reference Paragraphs 1-48, above, as if set forth verbatim.

58.

GAC failed to disclose the structural defect and caused the aircraft to be certified and represented as airworthy, meaning that it did not have any concealed major structural defects, conformed to the G450 type design, and was in condition for safe operation.

59.

Airworthiness is a material fact for any aircraft buyer, because an aircraft cannot be legally or safely flown unless it is airworthy and in compliance with the type and airworthiness certificates.

60.

GAC knew of the structural defect created during its own manufacturing process, knew the aircraft was not airworthy, and knew it was probable that the defect would not be discovered until 12 years after the aircraft was placed in service.

61.

GAC caused the aircraft to be certified as airworthy to induce reliance by purchasers of the aircraft such as PhosAsset.

62.

PhosAsset justifiably relied upon GAC's representations that the aircraft was airworthy.

63.

PhosAsset was damaged as a direct and proximate result of GAC's fraud and/or intentional misrepresentation and/or intentional concealment.

WHEREFORE, PhosAsset demands judgment against GAC for compensatory damages in excess of $75,000.00, plus any additional amounts subject to proof, interest, costs, and any other damages allowed under law.

This 14th day of July, 2021.

*/s/ Kenton J. Coppage*
Kenton J. Coppage
Georgia Bar No. 187190

Attorney for Plaintiff
PHOSASSET GmbH

FOX ROTHSCHILD LLP
999 Peachtree Street, Suite 1500
Atlanta, Georgia 30309
(404) 962-1065 – *Telephone*
(404) 962-1200 – *Facsimile*
kcoppage@foxrothschild.com